Filed 3/18/24  P. v. Thomason CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SEANTAZZ DOMONIK THOMASON,<br><br>    Defendant and Appellant. | F084809<br><br>(Super. Ct. No. BF173252C)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

On July 15, 2022, a jury convicted defendant Seantazz Domonik Thomason of, among other offenses, the first degree murder of Moises Leon[1] (Pen. Code, § 187; subd. (a), count 1). (Undesignated statutory references are to the Penal Code.) Gerrell Hasley, Jr. was tried in the same trial as defendant but had a separate jury. (Hasley filed a separate notice of appeal, which we separately address in case No. F084914.) The prosecutor's primary theory was that defendant shot and killed Leon, however, he alternatively argued defendant was guilty of murder as a direct aider and abettor even if the jury concluded he was not the actual killer. As to count 1, the trial court sentenced defendant to an indeterminate term of 25 years to life.

On appeal, defendant contends: (1) he received ineffective assistance of counsel when his trial counsel failed to object and request a curative instruction after codefendant Hasley's outburst during the trial; (2) his first degree murder conviction must be vacated "because the trial court instructed the jury on a theory of liability that allowed the jury to convict him of murder without finding that he personally acted with malice aforethought;" (3) the trial court prejudicially erred in failing to instruct the jury that Jamie Reed and Derrick Sutton were accomplices as a matter of law pursuant to CALCRIM No. 335; and (4) he received ineffective assistance of counsel when his trial counsel failed "to request an instruction [CALCRIM No. 350] on how to consider evidence of [his] character for nonviolence."

We conclude, that as to each individual claim, the trial court did not err, nor did defendant receive ineffective assistance of counsel. Accordingly, we affirm the judgment.

---

[1]Moises Leon also went by the name of Raul Soriano and is referred to as "Raul" throughout the record. However, all the documents throughout the clerk's transcript refer to the victim as "Moises Leon." Therefore, we will refer to the victim as "Leon" throughout the entirety of this opinion.

## PROCEDURAL HISTORY

On October 10, 2018, the Kern County District Attorney filed an information charging defendant with first degree murder (§ 187, subd. (a); count 1) with the allegation the murder was done by one of the following means: (1) destructive device or explosive; (2) weapon of mass destruction; (3) armor penetrating ammunition; (4) poison; (5) lying in wait; (6) torture; (7) willful, deliberate, and premeditated killing; (8) discharge of a firearm from a motor vehicle, intentionally at another person outside the vehicle, with the intent to inflict death; or (9) perpetration of, or attempt to perpetrate; arson, rape, carjacking, robbery, burglary, mayhem, or kidnapping; torture (§ 189, subd. (a); (§ 206; count 2); aggravated kidnapping (§ 209, subd. (b); count 3); and second degree robbery (§ 212.5, subd. (c); count 4).

On July 15, 2022, a jury found defendant guilty on all counts. Subsequently, as to count 1, the trial court sentenced defendant to an indeterminate term of 25 years to life. As to count 3, the trial court sentenced defendant to an indeterminate term of life with the possibility of parole after seven years, to run consecutive to count 1.[2] As to count 2, the trial court sentenced defendant to an indeterminate term of life with the possibility of parole after seven years, but stayed the sentence pursuant to section 654. As to count 4, the trial court sentenced defendant to the middle term of three years, but stayed the sentence pursuant to section 654.

## FACTS

### *The Prosecution Case-in-Chief*

#### Background

In July 2018, defendant, Hasley, Derrick Sutton, and Jamie Reed all lived at the Q Street apartment complex in Bakersfield. Alyssa G., a minor, lived with Reed. Sutton,

---

[2]The minute order indicating defendant's sentence as to counts 2, 3, and 4 are missing from the record on appeal. However, both the reporter's transcript and the abstract of judgment reflect defendant's sentence as to these remaining counts.

Reed, and Alyssa G. all testified pursuant to a testimonial immunity agreement. Reed also associated with Leon, and they worked together to steal merchandise and resell it at Leon's store. Reed referred to this practice as "boosting." Leon would give Reed half the cash received from reselling the stolen merchandise.

**The Plot to Rob Moises Leon**

During the summer of 2018, Reed often observed Leon with large amounts of cash on his person. Leon "would always be showing it. He would always say that he had enough to buy a car with it if he wanted to buy one, if he saw one. [Reed] always told him he needed to keep it in his pocket." On July 26, 2018, Reed called Sutton and suggested "that we rob [Leon]." Reed and Sutton decided they were "going to call [Leon] back to [her] apartment [¶] … [¶] [and] when he left, that's—that's when it would happen." Alyssa G. overheard this conversation and heard Reed explain to Sutton how she wanted the robbery to "go down." Reed was the "mastermind" behind the robbery.

Later on, defendant approached Sutton and told him "he wanted to get in on the robbery." Sutton told defendant he "was going to use a BB gun" and was "just trying to make it smooth, just get the money and let [Leon] go." However, defendant disagreed and told Sutton "he wanted to use real guns," but Sutton said he "didn't want to do that." Sutton and Reed had observed defendant in the past with a firearm.

**The Murder of Moises Leon**

Later that same night, Reed called Leon and told him "[t]o come back over and to hang out with [her] and Alyssa." (According to Reed, Leon "had a thing for Alyssa.") Leon came over to the apartment and they "discussed [Leon] … buying some beer and coming back to hang out some more." Leon then left the apartment and Alyssa G. observed Reed text Sutton it was "go time." Subsequently, Reed and Alyssa G. heard "commotion" outside the apartment door. Reed described hearing "[f]ighting, people fighting." Specifically, she testified she heard "[p]eople, they were like arguing, and

4.

somebody getting hit. When it was close to [her] door, [she] overheard voices talking about taking him to his bank to get money from the bank. Then it faded." Alyssa G. testified, "It was just like a lot of movement, like something was hitting the floor or [she] heard commotion. That was just it, like banging but like falling to the floor, then [she] heard [Leon] at one point." During this commotion, Leon was heard saying, "'[Reed], help.'" Reed also heard defendant and Hasley say, "'Let's take him to the bank.'"

Reed then told Alyssa G. "to go take a shower, and [Reed] started vacuuming." Reed looked out the window and saw Leon's truck, later identified as a red 2011 Chevrolet Silverado (Silverado), pull out of the parking lot and exit the Q Street apartment complex; defendant and Hasley were inside the Silverado with the victim. Fifteen minutes later, Sutton approached Reed and told her "it had gone too far and he didn't want to be involved anymore" and "that the two gentlemen [defendant and Hasley] had left in the [Silverado] with [Leon]."

Later on, defendant returned to the apartment and told Reed "he jumped out of the car when [Leon] got shot." At another point during the evening, Reed found Leon's white shirt with blood on it outside her front door; she burned the shirt in a pot behind her apartment. Reed then returned to the apartment and gave Alyssa G. "a bottle of peroxide mixed with bleach" and told her "to go scrub the dried blood off the stairs." Alyssa G. saw "[m]aybe like four or five" drops of blood on the stairs.

The next day, Reed observed defendant holding a pillowcase with something wrapped inside. Defendant told her there was a firearm inside the pillowcase, but she never personally observed the firearm. During a police interview, Reed told law enforcement she also observed a firearm "she referred to as the … automatic in a backpack that was brightly colored." Further, she told officers "the gun that she saw [defendant] with that night was a scary gun, which was bigger than [one of the interviewing officer]'s gun." Reed also told officers she had observed defendant "with a

5.

sawed-off shotgun before." Alyssa G. also told officers she had observed defendant with a firearm the night of the murder.

### The Subsequent Fire and Murder Investigation

On July 27, 2018, at approximately 3:30 a.m., the fire department responded to a vehicle fire on Pacheco Road in Bakersfield. Law enforcement and fire personnel located a Silverado parked in a parking stall in an alley with both its rear passenger side door and hood open. Fire personnel observed "smoke coming out the windows, [and] fire inside the cab." The fire was located "on the dash[board] of the front passenger side." Fire personnel "brought the hose line to the passenger side and extinguished the rest of the fire there."[3] Thereafter, they "opened up the back, just to open it up [and] [t]hat's where [they] found the deceased individual," later identified as Leon.

Leon was "laying on his stomach sprawled out" and "did not have a shirt on." There was blood along the back of his head and chest, and "there was also blood on the floorboard of the vehicle in the rear." Leon "had significant burning trauma to the front of his body and to his face," and "[h]e had several injuries on his back that were readily apparent from the exterior of the vehicle." He also "had pretty significant swelling between his eye and nose" and "his left shoulder was deformed, dislocated."

Further, Leon had a bullet wound in his left shoulder, a bullet graze wound on his chest and right shoulder, and a bullet graze wound on his left ear near where a bullet entered through the base of the skull. A bullet was located inside Leon's skull, and it was determined it was shot into his head behind his left ear and was "traveling upward forward and to the right." There was "no soot, stippling, nor [was] there any gunpowder

---

[3]A fire investigation discovered "torn up pages of a phonebook and some other debris that appeared to be from the glove box of the vehicle that had burned and that had also burned the carpet below those items." Arson investigator Victor Mabry testified there "were indeed two separate and independent areas of fire, [and] [t]hey were both intentionally set on fire with an open flame device, such as a cigarette lighter or a match, and the ordinary combustible items of paper, like a telephone book and items in the glove box that [he] found inside."

residue deep within the wound tissue," which meant the firearm must have been between two to four feet away when fired. It was determined Leon's body was burned after death. It was further determined Leon had "been deceased for 2 to 12 hours" before being discovered by fire personnel. Pathologist Eugene Carpenter testified the cause of death was "[m]ultiple gunshot wounds."

### *Physical Evidence Found at the Crime Scene*

Law enforcement also investigated the surrounding crime scene. Officers searched the Silverado and located "blood on the floorboard of the vehicle in the rear" and a "transfer of smeared blood on the headrest of the front driver's and passenger seat." Further, there were "blood transfer patterns on the door handle as well as the door latch," and blood staining on the front driver's seat and gray center console. In the Silverado's rear bed area "[t]here was a dent with a—what appeared to be the impression of [something] being pressed up against it," and there was a "transfer of blood on the bed." Defendant's left palm print was located on the driver's side of the truck.

Officers also located "a bullet projectile … underneath the headliner or inside the headliner." It was determined "the bullet was traveling from a direction just, in general, from the driver's side toward the passenger side of the vehicle." However, it was unclear whether the bullet was shot from the front driver's seat or the rear driver's seat.

It was stipulated "[t]he spent bullet recovered during the autopsy of … Leon and the two spent bullets located in the red [Silverado] truck where Mr. Leon's body was found were fired by the same gun."

Later that same morning on July 27, 2018, Leon's wallet was found in the "middle of the street" on Panaroma Drive.

### Defendant's Arrest and Subsequent Interview

On July 31, 2018, defendant was arrested at the Q Street apartment complex. No firearms were located on defendant's person, nor were any firearms found inside the

apartment. Following his arrest, Detectives Robert Pair and Eric Littlefield interviewed defendant. Initially, defendant denied having any knowledge of the robbery and murder and claimed he was with his wife at the gym.

However, defendant eventually admitted he observed a Black man beating a Hispanic man shortly before he and his wife left for the gym. He told detectives he observed the two men "just … going and fighting and arguing." The Hispanic man "got in the back seat, [and] the other two got in [the] front" of the Silverado. Defendant then decided to "jump in" with the men. He then heard the two individuals "arguing and from the back seat to the front seat and [he] just heard pow ow ow." Defendant then asked to be dropped off at Panama Lane. During the interview, defendant wrote down on a piece of paper that Hasley was seated in the driver's seat, Sutton was seated in the front passenger seat, and Leon was seated in the rear passenger seat.

### Cell Phone Evidence

Law enforcement also seized defendant's cell phone. Kern County District Attorney Investigator Brian Canaday testified as an expert in analyzing cell phone data. Investigator Canaday analyzed defendant's cell phone usage and concluded his cell phone had connected to towers near the Q Street apartment complex between 8:00 p.m. and 9:00 p.m. Further, between 9:40 p.m. and 9:51 p.m., defendant made several calls that utilized a cell tower near the Pacheco Road address and Panama Lane, where he was eventually dropped off. Finally, between 10:00 p.m. and 12:00 a.m., defendant's phone engaged in activity that utilized cell towers near the Pacheco Road address, which included five calls received between 10:11 p.m. and 11:12 p.m.

### *The Defense Case-in-Chief*

Defendant testified in his own defense. He testified he was working on his car when he "heard a bunch of commotion over by … Reed's house, and then they were over there fighting and stuff." He observed Hasley, "Hasley's supposed[] street dad," Sutton,

and Leon fighting. Hasley then forced Leon into the Silverado. Subsequently, Hasley got in the driver's seat, Hasley's "street dad" in the front passenger seat, and Leon into the rear passenger seat of the Silverado. Defendant acknowledged previously telling officers Sutton was the front passenger, but testified he was mistaken.

After observing Leon being forced into the Silverado, defendant entered the rear driver's seat next to Leon "[t]o defuse the situation, to try to defuse the situation." Leon had blood coming "[f]rom his head," and "[h]e was swollen in the face at the time."

Hasley and Leon started arguing about money and "[t]hat's when … [Leon] took out his wallet, and [defendant] showed [Hasley]. Look, [Hasley], there's no money in here." Hasley and Leon started "grabbing hands" and fighting on the center console area. At this point, defendant observed Hasley shoot Leon three times from the driver's seat. Subsequently, defendant told Hasley, "[D]rop me off. I don't want to be in this vehicle, you know. I don't know what the heck is going on, and that's when [defendant] had got dropped off" at Panama Lane where his wife eventually picked him up. Defendant then got rid of his clothes because they were covered in blood. He further testified he never owned or possessed any firearms.

## DISCUSSION

I.  **Defendant Did Not Receive Ineffective Assistance of Counsel When His Trial Counsel Failed to Object and Request a Curative Instruction After Codefendant Hasley's Outburst During the Trial**

Defendant contends he suffered prejudice due to Hasley's outburst during his direct examination. However, both parties agree trial counsel failed to object and ask the trial court to provide the jury with a curative instruction, which forfeits this argument on appeal. To overcome forfeiture, defendant argues he received ineffective assistance of counsel when his trial counsel failed to object and ask the trial court for an admonition.[4]

_____

[4]Defendant further contends "Hasley's unexpected outburst, albeit limited to a single incident, was nonetheless incurably prejudicial because of its nature …, [i.e.,] the 'condemning

9.

## A.     Additional Factual Background

During defendant's direct examination, defendant described the events leading up to Leon's murder. The following relevant exchange occurred between the trial court, defendant, trial counsel, and Hasley:

> "[TRIAL COUNSEL] Q.  Who was up there fighting, if you remember?
>
> "[DEFENDANT] A.  It was Hasley and it was his dad.  [¶] … [¶]
>
> "[TRIAL COUNSEL] Q.  Do you know what they were fighting or arguing about?
>
> "[DEFENDANT] A.  No, sir.
>
> "[TRIAL COUNSEL] Q.  Then what happened?
>
> "[DEFENDANT] A.  Then after that, they had—they were still arguing then they were down there getting in the vehicle, which I obviously know [Hasley] so, you know, down there he gets in the vehicle.  First he puts [Leon] in the vehicle, gets in—okay.  He gets in the vehicle.
>
> "[HASLEY]:  That's a lie.  Don't do that.
>
> "THE COURT:  Mr. Hasley.
>
> "[HASLEY]:  Tell the truth brother.
>
> "THE COURT:  Mr. Hasley.
>
> "[HASLEY]:  Sorry about that.
>
> "THE COURT:  You're going to testify?

_____

power' of a codefendant's statement directly challenging the credibility of the defendant's testimony at trial is so strong 'that jurors cannot be expected to wipe [it] from their minds.…'" However, as both parties agree, the question of incurable prejudice was never brought before the trial court, and thus, defendant's argument is forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 435 ["A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct"].)  By not seeking a mistrial, defendant forfeited the argument that Hasley's outburst caused incurable prejudice and therefore, we do not address this argument in this appeal. (*People v. Woodberry* (1970) 10 Cal.App.3d 695, 708 ["[A] motion for mistrial presupposes error plus incurable prejudice" and requires the trial to be "terminated"].)

"[HASLEY]: I might.

"THE COURT: No. You already said you weren't so you have to be quiet.

"[HASLEY]: Yes, sir.

"THE COURT: Go ahead."

At this point, defense counsel continued with defendant's direct examination.

## B.     Applicable Law

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, disapproved on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland*, *supra*, 466 U.S. at p. 689.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Reversal is permitted "'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) "In light of

11.

the deferential standard, appellate courts do not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight and, for this reason, tactical errors do not generally provide a basis for reversing a conviction." (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 55, accord, *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

### C. Analysis

Applying *Strickland*'s two-part test, defendant's claim of ineffective assistance of counsel fails on both prongs.

Here, we are unable to say trial counsel's performance was deficient because there are plausible tactical reasons for not asking the trial court for a curative instruction regarding Hasley's brief outburst. Trial counsel may have decided not to request an admonition to avoid drawing the jury's attention to this brief incident. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["[C]ounsel could also have decided that objecting would focus the jury's attention … in ways that would not be helpful to the defense"]; see also *People v. Ghent* (1987) 43 Cal.3d 739, 772–773 [holding that although defense counsel failed to object to the prosecutor's personal opinion regarding the appropriateness of the death penalty in the case, ineffective assistance of counsel was not found because "[c]ounsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"].) At the outset, Hasley's outburst was brief and swiftly addressed by the trial court. Trial counsel may have decided that instead of focusing the jury's attention to this outburst by having the court provide it with a curative instruction, it benefited defendant to move on and continue with the direct examination. On the other hand, because defendant and Hasley's credibility was vital to the defense's case-in-chief, trial counsel may have tactically decided this outburst benefited defendant in that it portrayed Hasley as aggressive, unruly, and uncredible. Regardless of whether trial counsel believed this outburst benefitted or hurt his case, "it would be a rare case in which the

merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance" of counsel. (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

However, even assuming trial counsel's performance was deficient, defendant was not prejudiced. First, as noted above, this outburst was brief and isolated. (See *People v. Shazier* (2014) 60 Cal.4th 109, 150 [holding that although the prosecutor committed misconduct, the defendant was not prejudiced because "[t]he cited incidents were relatively isolated portions of the prosecutor's lengthy arguments"].) Second, the jury was properly instructed to "not let bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision" (CALCRIM Nos. 101, 200), that it is up to the jury "to decide what happened, based only on the evidence that has been presented to you in this trial" (CALCRIM No. 200), and "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial" (CALCRIM No. 220). Further, the jury was instructed "[y]ou alone, must judge the credibility or believability of the witnesses … [and] [y]ou must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have" (CALCRIM No. 226). Because we presume jurors are "able to understand and correlate instructions and are further presumed to have followed the court's instructions," we are confident in finding that even if trial counsel's performance was deficient, defendant was not prejudiced. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

## II. The Jury Properly Found that Defendant Acted with Malice in the Killing of Leon

Defendant further contends his conviction for first degree murder must be vacated "because the trial court instructed the jury on a theory of liability that allowed the jury to convict him of murder without finding that he personally acted with malice aforethought." Specifically, defendant argues the jury instructions "permitted the jury to

13.

convict him on a theory under which malice was imputed to him based solely on his participation in a lesser crime …, [which] was contrary to … section 188, subdivision (a)(3)."

## A. Forfeiture

The People contend "this issue has been forfeited" because defendant "failed to object to the jury instructions." Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012.) "The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) "'"Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." [Citation.]'" (*Ibid.*)

Here, as discussed *post*, CALCRIM No. 401 is a flawed instruction as applied to aiding and abetting implied malice murder. Consequently, defendant has not forfeited this issue on appeal even though he failed to object to the instruction in the trial court.

## B. Additional Factual Background

The prosecutor's primary argument was that defendant was the actual shooter, however, he alternatively argued defendant could be found guilty of murder as a direct aider and abettor if the jury instead concluded Hasley was the shooter.

Subsequently, the jury was instructed on the crime of first or second degree murder with malice aforethought (CALCRIM No. 520). The instruction was as follows:

> "The defendants are charged in Count ONE with murder.
>
> "To prove that a defendant is guilty of this crime, the People must prove that:

14.

"1.  The defendant committed an act that caused the death of another person;

"AND

"2.  When the defendant acted, he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

"The defendant had *express malice* if he unlawfully intended to kill.

"The defendant had *implied malice* if:

"1.  He intentionally committed the act;

"2.  The natural and probable consequences of the act were dangerous to human life;

"3.  At the time he acted, he knew his act was dangerous to human life;

"AND

"4.   He deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time."  (Italics in original.)

Specifically, as to first degree murder (CALCRIM No. 521), the jury was instructed as follows:

"A defendant has been prosecuted for first degree murder under two theories:  (1) the murder was willful, deliberate, and premeditated, (2) the murder was committed by torture[.]

"Each theory of first degree murder has different requirements, and I will instruct you [on] both.

"You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory.

"A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premediated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"A defendant is guilty of first degree murder if the People have proved that the defendant murdered by torture. The defendant murdered by torture if:

"1. He willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive;

"2. He intended to inflict such pain on the person killed for the calculated purpose of extortion or persuasion[;]

"3. The acts causing death involved a high degree of probability of death;

"AND

"4. The torture was a cause of death.

"There is no requirement that the person killed be aware of the pain.

"A finding of torture does not require that the defendant intended to kill." (Italics in original.)

16.

Finally, as to direct aider and abettor liability (CALCRIM No. 401), the trial court instructed the jury as follows:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

"A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things:

"1. He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating. The notification must be made early enough to prevent the commission of the crime.

"AND

17.

"2.  He or she must do everything reasonably within his or her power to prevent the crime from being committed.  He or she does not have to actually prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw.  If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."  (Italics in original.)

Subsequently, during closing argument, the prosecutor argued the following:

"Let's go with first degree murder.  Again, this requires an intent to kill.  There's three theories that are provided to you in the jury instructions for first degree murder.  I'll go through those, but they are premeditation and deliberation, torture, then ultimately felony murder.  Those are the three.

"Now if you find that it's second degree murder and then you all start going through first degree murder and somebody thinks it's premediated and deliberate.  Somebody thinks it's torture.  Somebody thinks it's felony murder.  As long as everybody thinks it's first degree murder, that's fine."

## C.    Applicable Law

### 1.      *General Principles*

"[S]ection 187 defines 'murder' as 'the unlawful killing of a human being … with malice aforethought.'  (*Id*., subd. (a).)"  (*People v. Brown* (2023) 14 Cal.5th 453, 461, (*Brown*).)  "For purposes of Section 187, malice may be express or implied."  (§ 188, subd. (a).)  "It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation … or when the circumstances attending the killing show an abandoned and malignant heart.'  (§ 188, subd. (a)(2))."  (*People v. Gentile* (2020) 10 Cal.5th 830, 844.)  "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not."  (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

As relevant here, section 189, subdivision (a) provides that "[a]ll murder that is perpetrated by means of … torture … is murder of the first degree."  "For a killing with

malice aforethought to be first rather than second degree murder, the intent to kill must be formed upon a preexisting reflection and have been the subject of actual deliberation or forethought." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.) "In contrast, murder by means of torture, a statutorily listed type of first degree murder (§ 189), does not require an intent to kill, but requires the intent to torture, and requires the same proof of deliberation and premeditation as is required of other kinds of first degree murders." (*Ibid.*, citing *People v. Steger* (1976) 16 Cal.3d 539, 546.) "[I]t is well settled that '"the words 'wil[l]ful, deliberate, and premediated intent to inflict extreme and prolonged pain[]' refer[] only to the requirement that before the trier of fact may convict a defendant of first degree murder by torture there must be found a cold-blooded, calculated intent to inflict such pain for one of the specified purposes. Inasmuch as the Legislature has equated this state of mind with the wil[l]ful, deliberate, premeditated intent to kill that renders other murder sufficiently culpable to be classified as first degree murder, it is unnecessary in torture-murder to also find that the killing itself was 'wil[l]ful, deliberate, and premeditated.'"'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 295.) As our Supreme Court made clear, "'It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. [Citation.] Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction—which society condemns. Such a crime is more susceptible to the deterrence of first degree murder sanctions and comparatively more deplorable than lesser categories of murder.'" (*Brown*, *supra*, 14 Cal.5th at p. 464; see *People v. Wiley* (1976) 18 Cal.3d 162, 168 [holding that torture is designated as first degree murder because of "the calculated nature of the acts causing death," which makes torture particularly reprehensible].)

Further, under section 206, "torture has two elements: (1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so

with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223.)  The offense "focuses on the mental state of the perpetrator and not the actual pain inflicted" (*People v. Hale* (1999) 75 Cal.App.4th 94, 108 (*Hale*)), however, it does require an "inflict[ion] of great bodily injury … upon the person of another."  (§ 206.)

Torture "is a major crime and 'fills a gap in existing law dealing with extremely violent and callous criminal conduct.…  Section 206 is the electorate's response to a particular type of violence animated by a discrete and especially reprehensible intent.'" (*Hale*, *supra*, 75 Cal.App.4th at p. 107, quoting *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1566.)  However, unlike torture murder, "the plain language of section 206 *does not* require willful, deliberate, and premeditated intent."  (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1206, citing § 206, italics added.)  "This is a critical point of distinction between section 206 and section 189, which *expressly* requires such intent for murder by torture because it is a kind of first degree murder."  (*People v. Aguilar*, at p. 1206, italics in original.)

### 2.      CALCRIM No. 401 & Implied Malice Murder

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 984, 990; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile*, *supra*, 10 Cal.5th at pp. 842–843.)  Senate Bill 1437 amended section 188, subdivision (a)(3), which now requires that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime."

20.

Following the passage of Senate Bill 1437, several cases have addressed issues with specific jury instructions and whether these instructions permit jurors to impute malice to a defendant in violation of section 188, subdivision (a)(3). The three primary cases are *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*), *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), and *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*). We discuss each case in depth below.

In *Powell*, defendants Powell and Langlois broke into the victim's house and beat the victim and fled. (*Powell*, *supra*, 63 Cal.App.5th at pp. 691–692.) The prosecution contended Powell inflicted the fatal blow, and as to Langlois the prosecutor advanced two theories of liability: "(1) direct aiding and abetting express malice murder, and (2) indirect or extended liability for the natural and probable consequences of the assault Langlois aided and abetted." (*Id.* at p. 708.) The *Powell* court concluded the standard CALCRIM aiding and abetting instruction (CALCRIM No. 401) was "not tailored for" the crime of second degree implied malice murder.[5] (*Powell*, at p. 714.) For implied malice murder liability, "[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to

---

[5]The trial court in *Powell* instructed the jury with CALCRIM No. 401 as follows:

"'To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove the following: [¶] 1. The perpetrator committed the crime. [¶] 2. The defendant knew that the perpetrator intended to commit *the crime*. [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing *the crime*; and [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of *the crime*. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor; however, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him an aider and abettor.'" (*Powell*, *supra*, 63 Cal.App.5th at pp. 706–707, italics added by *Powell*.)

aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Id*. at p. 713.) While CALCRIM No. 401 requires an intent to aid and abet a "crime," it does not instruct the jury the aider and abettor must personally harbor that mental state of implied malice to be convicted of second degree murder. (*Powell*, at p. 714.) Therefore, the instructions were erroneous. With that being said, the *Powell* court went on to conclude the instructional error was harmless beyond a reasonable doubt because the prosecutor never advanced an implied malice theory as to Langlois. (*Id.* at pp. 714–716.)

In *Langi*, the defendant was convicted of second degree murder, battery, and robbery in connection with the beating death of a robbery victim. (*Langi*, *supra*, 73 Cal.App.5th at pp. 975–977.) A group of people, including the defendant, punched the victim and caused him to fall and hit his head. (*Id*. at p. 976.) "As the case was tried, the jury could have found [the defendant] guilty as an aider and abettor even if it found that someone else threw the fatal punch." (*Id*. at p. 980.) The defendant's jury was not instructed on the natural and probable consequences doctrine, but was instructed on second degree murder under CALJIC No. 8.31 and aiding and abetting under CALJIC No. 3.01.[6] (*Langi*, at p. 981.) CALJIC No. 3.01 was "identical in relevant substance" to CALCRIM No. 401. (73 Cal.App.5th at pp. 981, 983.)

---

[6]In *Langi*, the jury was instructed with CALJIC No. 8.31, which stated the following:

"[A] killing is a second degree murder if '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.'" (*Langi*, *supra*, 73 Cal.App.5th at p. 981.)

The jury was also instructed with CALJIC No. 3.01, which stated the following:

"'A person aids and abets the commission … of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] 2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime, … [¶] (3) By act or

Applying *Powell*'s reasoning, *Langi* found on a petition for resentencing pursuant to former section 1170.95 that although the aiding and abetting instruction stated a person aids and abets a crime if he or she acts "'with knowledge of the unlawful purpose of the perpetrator, and … with the intent or purpose of committing or encouraging or facilitating the commission of the crime,'" "the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death." (*Langi*, *supra*, 73 Cal.App.5th at p. 982, italics omitted.) "Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Langi*, at pp. 982–983.) The instructions, thus, permitted the jury "to conclude that, to be guilty as an aider and abettor of second degree murder, [the defendant] need only have intended to encourage the perpetrator's intentional act—in this case, punching [the victim]—whether or not [the defendant] intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Id*. at p. 983.) Overall, the aiding and abetting instruction created an ambiguity under which the jury could "find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Id*. at p. 982.)

---

advice aids, promotes, encourages or instigates the commission of the crime.'" (*Langi*, *supra*, 73 Cal.App.5th at p. 981.)

These instructions are identical in substance to the instructions as given to the jury here.

Finally, in *Maldonado*, the defendant was charged with first degree murder with a special circumstance alleging the murder was committed by means of lying in wait. (*Maldonado*, *supra*, 87 Cal.App.5th at p. 1260.) The jury was instructed on two theories of first degree murder: willful, deliberate, and premeditated murder, and murder by lying in wait. The jury was also instructed on direct aiding and abetting. (*Ibid*.) The defendant was convicted of murder, but the jury found the special circumstance allegation not true. (*Ibid*.)

On appeal from a denial of a petition for resentencing pursuant to section 1172.6, the defendant argued the record did not conclusively negate the possibility that malice had been imputed to him, because "[u]nlike first degree premeditated murder, 'nothing in section 189 requires the lying in wait to have been done with the intent to kill.'" (*Maldonado*, *supra*, 87 Cal.App.5th at p. 1262, quoting *People v. Laws* (1993) 12 Cal.App.4th 786, 794.) The *Maldonado* court observed the jury instructions given merely required the defendant to know of the perpetrator's intent to commit a surprise attack and to aid in that purpose. According to the court, this did not require the jury to find the defendant had acted with implied malice. (*Id*. at p. 1267.) Based upon the ambiguous jury instructions and the prosecutor's comments in closing argument, the court agreed with the defendant's assertion the trial court erred in denying his petition for resentencing at the prima facie stage. (*Id*. at p. 1269.)

### 3. *No Prejudice*

Defendant argues "[l]ike the version of CALCRIM 401 given in *Maldonado* (and, for that matter, the version of CALCRIM 401 given in *Powell* and the version of CALJIC 3.01 given in *Langi*), the version of CALCRIM 401 given in this case … allowed the jury to conclude that [he] intended to aid and abet the torture of Moises Leon—i.e. the infliction of pain—without concluding that he himself intended to kill Leon or that he assisted Hasley with a conscious disregard for human life." Although we agree

24.

CALCRIM No. 401 is generally a flawed instruction as applied to aiding and abetting implied malice murder,[7] we find the concerns outlined in *Powell*, *Langi*, and *Maldonado* not present in this case, and in applying review under *Chapman v. California* (1967) 386 U.S. 18 we find any instructional error harmless beyond a reasonable doubt. (*In re Lopez* (2023) 14 Cal.5th 562, 568 [under the *Chapman* standard, "a reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability"].)

---

[7]In response to this flaw, as of November 2023, the Judicial Council of California added CALCRIM No. 526 (Implied Malice Murder: Aiding and Abetting). (CALCRIM No. 526 (Nov. 2023 update).) The instruction is as follows:

"To prove that the defendant is guilty of aiding and abetting murder by acting with implied malice, the People must prove that:

"1. The perpetrator committed [an] act[s] that (was/were) dangerous to human life;

"2. The perpetrator's act[s] caused the death of (another person/ [or] a fetus);

"3. The defendant knew that the perpetrator intended to commit the act[s] that (was/were) dangerous to human life;

"4. Before or during the commission of the perpetrator's act[s], the defendant intended to aid and abet the perpetrator in committing the act[s] that (was/were) dangerous to human life;

"5. Before or during the commission of the perpetrator's act[s], the defendant knew the perpetrator's act[s] (was/were) dangerous to human life, and the defendant deliberately acted with conscious disregard for human life;

"AND

"6. By words or conduct, the defendant did in fact aid and abet the perpetrator's commission of the act[s].

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"An act is *dangerous to human life* if there is a high degree of probability that the act will result in death."

25.

Harmless error analysis under *Chapman* entails "'examining the entire cause, including the evidence, and considering all relevant circumstances'" to determine whether, beyond a reasonable doubt, the error did not contribute to the verdict. (*In re Ferrell* (2023) 14 Cal.5th 593, 602.) "In other words, if '"[n]o reasonable jury"' would have found in favor of the defendant on the missing fact [or invalid theory], given the jury's actual verdict and the state of the evidence, the error may be found harmless beyond a reasonable doubt." (*In re Lopez*, *supra*, 14 Cal.5th at p. 580, quoting *People v. Aledamat* (2019) 8 Cal.5th 1, 15.) "'To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Neal* (2003) 31 Cal.4th 63, 86.) In other words, the *Chapman* harmless error inquiry asks: "'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?'" (*People v. Geier* (2007) 41 Cal.4th 555, 608, quoting *Neder v. United States* (1999) 527 U.S. 1, 18, disapproved on another ground in *People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.) Since *Chapman*, our high court has "'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'" (*Geier*, at p. 608.) "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We consider the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).)

26.

### a.        The Jury Instructions

Here, we are able to "'confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'" (*People v. Geier*, *supra*, 41 Cal.4th at p. 608.) As noted, *Langi* and *Maldonado* found CALJIC No. 3.01 and CALCRIM No. 401 permitted a jury to convict a defendant of aiding and abetting second degree murder without a finding that he or she personally acted with malice. (*Langi*, *supra*, 73 Cal.App.5th at pp. 982–983; *Maldonado*, *supra*, 87 Cal.App.5th at p. 1266.) Specifically, *Langi* was concerned the second degree murder and aiding and abetting instructions taken together allowed the jury to find the defendant "guilty as an aider and abettor of second degree murder … whether or not [the defendant] intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Langi*, *supra*, at p. 983.) Additionally, in *Maldonado* the court concluded, "The murder by lying in wait instruction did not instruct the jury that the perpetrator needed to intend to cause death [and] [w]hile the perpetrator must have concealed his purpose from the victim, waited and watched for an opportunity to act, intentionally made a surprise attack from a position of advantage, and have lain in wait for a substantial enough duration to show a state of mind equivalent to deliberation or premeditation, the jury may have found the perpetrator's *purpose* was only to injure or intimidate the victim in a surprise attack." (*Maldonado*, *supra*, at p. 1266.) Therefore, there was a reasonable likelihood the jury imputed malice towards the defendant before finding him guilty of first degree murder. (*Id*. at pp. 1268–1269.)

Here, the three first degree murder theories proffered by the prosecutor were "the murder was willful, deliberate, and premediated," "the murder was committed by torture," or felony murder. Although the prosecutor's primary theory of the case was that defendant was the shooter and killed Leon, the prosecutor alternatively argued defendant still aided and abetted murder even "if [the jury] believe[d] Mr. Hasley shot" Leon. As noted above, the jury was instructed with CALCRIM No. 401, which stated that a person

27.

aids and abets a crime if "he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." If the jury concluded that defendant aided and abetted in premeditated first degree murder, which requires a finding of express malice, that would be the end of our discussion. (See generally *People v. Coley* (2022) 77 Cal.App.5th 539, 547 [holding *Langi* only applies to cases involving *implied* malice, not *express* malice].) However, even assuming the jury convicted defendant of aiding and abetting torture murder, defendant's claim still fails.

As noted above, the *Langi* and *Maldonado* courts concluded CALJIC No. 3.01 and CALCRIM No. 401 created the possibility the jury convicted the defendants of aiding and abetting second degree murder even if it concluded the defendants intended only to aid in "punching [the victim]" (*Langi*, *supra*, 73 Cal.App.5th at p. 983) or in a "surprise attack" (*Maldonado*, *supra*, 87 Cal.App.5th at p. 1266). Here, defendant argues the jury could have concluded he only intended to "inflict pain" upon Leon without concluding he himself possessed malice. We disagree with this conclusion based on the jury instructions given. The jury was instructed it had to find beyond a reasonable doubt that "[t]he defendant murdered by torture if [¶] [h]e willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive," "[h]e intended to inflict such pain on the person killed for the calculated purpose of extortion [or] persuasion," "[t]he acts causing death involved a high degree of probability of death," and "[t]he torture was a cause of death." (See CALCRIM No. 521.) Thus, the intent to commit torture murder required "a mental state more 'cruel and aggravated' than malice—a mental state equivalent in turpitude to willfulness, deliberation, and premeditation." (*Brown*, *supra*, 14 Cal.5th at pp. 465–466.) As our Supreme Court stated, the phrasing of section 189 makes the following clear: "'All murder which is perpetrated by means of … torture, or by *any other kind* of willful,

28.

deliberate, and premeditated killing … is murder of the first degree ….'  In labeling torture as a 'kind' of premeditated killing, the Legislature *requires the same proof of deliberation and premeditation for first degree torture murder that it does for other types of first degree murder*."  (*People v. Steger*, *supra*, 16 Cal.3d at pp. 545–546, second italics added.)

Further, the jury instructions as a whole support this conclusion.  (*Houston*, *supra*, 54 Cal.4th at p. 1229.)  The jury was instructed regarding the crime of murder, "the defendant acted [with] … a state of mind called malice aforethought" and that malice aforethought can be either express or implied (CALCRIM No. 520), and that in order to "find a person guilty of the crime in this case, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and mental state.  The act and the specific intent and mental state required are explained in the instruction for that crime" (CALCRIM No. 251).  Further, as to aiding and abetting, the jury was instructed "[s]omeone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime" (CALCRIM No 401).[8]  As our Supreme Court stated, "If anything, 'purpose' is a higher standard than 'intent.'"  (*People v. Hardy* (2018) 5 Cal.5th 56, 96.)  Therefore, taking these instructions together, it is clear the jury would have understood the direct perpetrator committed the crime of murder, which encompassed an act causing the death of another combined with malice, and the direct aider and abettor must have also acted with the

---

[8]The trial court's oral instructions to the jury did not include this specific language of CALCRIM No. 401, but the written instructions did.  "'To the extent a discrepancy exists between written and oral versions of jury instructions, the written instructions provided to the jury will control.'"  (*People v. Mills* (2010) 48 Cal.4th 158, 201, quoting *People v. Wilson* (2008) 44 Cal.4th 758, 803.)

required mental state for torture murder. For these reasons, the concerns outlined in *Powell*, *Langi*, and *Maldonado* are not present in this case.

### b. The Evidence

Additionally, when evaluating the evidence in this case, the evidence shows beyond a reasonable doubt the jury did not convict defendant under a theory of imputed malice. First, the evidence strongly supports the conclusion defendant was the actual killer. The prosecutor's primary theory was that defendant was the actual killer, and he argued the following during closing arguments:

> "… Now as I said before, I believe the evidence points to … [defendant] is the shooter. I'll go through why I believe that is the case.

> "One, he's in the back seat right next to him. It's a truck. It's wide, has to be more than two feet. Two feet is not outrageous. You know how far two feet, maybe it's right there. We're not talking 12 feet. We're talking two feet. So the testimony of [the criminalist], either the front driver or back passenger on the left shot the gun.

> "That's where the bullet came from. So it goes from left to right as you look at this picture from driver's side to passenger side. So obviously based on that, as it sits, it's either Mr. Hasley who fired the gun or it's [defendant] who fired the gun. Well, look at the trajectory. What is the trajectory? What do you know? It's upward. It's upward.

> "There's a trajectory rod going through the body of Mr. Leon. There's the other trajectory again upward. There's the other trajectory upward. What do you know about the bullet? One of them—where they end up? It ends up in the headliner. It ends up in the headliner.

> "So take what you know about the trajectory, the upward motion and explain or think about it again, apply common sense to Gerrell Hasley is the driver. Mr. Leon is in the back to the right of him. How does the bullet end up in the headliner? It doesn't. He'd have to contort his body, lean over and shoot like that upward. It's not happening.

> "This isn't a Marvel movie. It's not four dimensions here. The shooter is [defendant]. It makes absolute sense. He's sitting over. He's not on the seat above. He's not on the ground right next to him. Three shots. One ends up in the headliner; one ends up in his head; one goes

30.

through his body into his chest out his shoulder.  [¶] That's what trajectory points to.  That's he's the shooter."

The final argument heard by the jury before its deliberation was that "because of that robbery, [defendant] shot and killed Moises Leon.  He shot and killed him [and] based on the evidence in this case, I'd ask you to find [defendant] guilty of first degree murder, that of Mr. Leon."  Additionally, Reed told officers she had observed defendant with a firearm before and after the offense, Sutton testified defendant approached him about using a real firearm during the robbery, and Sutton never observed Hasley with a firearm.  Accordingly, it is likely the jury convicted defendant as the actual killer.

Further, the evidence supports a finding of first degree premeditated murder.  To be "deliberate," the murderer must have engaged in a "careful weighing of considerations in forming a course of action."  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  However, the course of action subject to the required deliberation is no less than the act of killing—"the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death."  (*People v. Chiu* (2014) 59 Cal.4th 155, 166, superseded by statute on other grounds as stated in *People v. Lewis*, *supra*, 11 Cal.5th at p. 959, fn. 3.)  As noted above, Leon was beaten and shot three times, including a fatal shot to the base of his skull.  The killing was not made rashly or impulsively, but rather occurred after Leon had been kidnapped, robbed, tortured, and driven around Bakersfield for a significant period of time.  Therefore, there was ample time for defendant to reflect on his decision to shoot and kill Leon.  (*People v. Koontz*, *supra*, at p. 1080 ["'"The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly"'"].)

Alternatively, the evidence supports a finding of first degree felony murder.  As noted above, there is ample evidence defendant shot Leon and thus, is guilty of first degree murder as the actual killer.  (§ 189, subd. (e).)  However, the jury could have

convicted defendant of felony murder as an aider and abettor because he was a major participant in the robbery and kidnapping who acted with reckless indifference to human life. (*People v. Banks* (2015) 61 Cal.4th 788; *People v. Clark* (2016) 63 Cal.4th 522.) In order to help determine whether an individual was a "major participant," our Supreme Court identified various factors that may play a role. These factors include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient[;] [a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid.*)

Additionally, in *Clark*, our Supreme Court identified various factors relevant in determining whether a defendant acted with "reckless indifference to human life." Those "[r]elevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677, citing *People v. Clark*, *supra*, 63 Cal.4th at pp. 618–

623.) "'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'" (*Clark*, at p. 618.)

Applying the *Banks* factors, there is strong evidence defendant was a major participant in the robbery. First, defendant approached Sutton and told him he wanted in on the robbery and suggested the group use real firearms, and he was seen before and after the offenses with a firearm. Second, defendant voluntarily entered the Silverado and purposefully involved himself in the robbery. Third, after the killing, defendant exited the Silverado, never called 911 in order to render aid to Leon, and was then subsequently picked up by his wife and headed home. Further, applying the *Clark* factors, defendant again was seen with a firearm before and after the robbery, he was present during the entirety of the offenses, he was seated next to Leon when Leon was shot and killed, and he had the opportunity to call 911 to render aid, but never did. (The jury was instructed with CALCRIM No. 540B, which incorporated both the *Banks* and *Clark* factors.)

### c.      Aiding and Abetting Torture

Although we can confidently say beyond a reasonable doubt defendant was convicted of murder either as the actual killer, an aider and abettor to torture murder, or under a theory of felony murder, defendant, nonetheless, argues the instructions allowed the jury to impute malice if it concluded he intended to only aid and abet in torture. As noted above, the intent to aid and abet torture requires a "'discrete and especially reprehensible intent'" (*Hale*, *supra*, 75 Cal.App.4th at p. 107), specifically the intent to "cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) On the other hand, "'[m]alice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious

33.

disregard for life.'"'"" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) It is clear the intent to torture requires a more "reprehensible intent" than that of implied malice. (*Hale*, at p. 107.)

For example, the United States Supreme Court provided an example of conduct constituting "reckless indifference to human life" and deserving of the death penalty when it stated, "On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who *tortures* another not caring whether the victim lives or dies." (*Tison v. Arizona* (1987) 481 U.S. 137, 157, italics added.) Specifically, "the 'reckless indifference to life' necessary for death penalty eligibility requires subjective awareness of a higher degree of risk than the 'conscious disregard for human life' required for conviction of second degree murder based on implied malice." (*People v. Johnson* (2016) 243 Cal.App.4th 1257, 1285.) Therefore, even assuming the jury found defendant only aided and abetted torture, it still had to find defendant possessed at a minimum implied malice when it found him guilty of torture (count 2).

Accordingly, there is evidence beyond a reasonable doubt the jury did not convict defendant under an invalid theory of murder, and thus, any instructional error did not contribute to the verdict.

### III. The Trial Court Properly Instructed the Jury on Accomplice Liability Under CALCRIM No. 334

Defendant further contends "the trial court [prejudicially] erred in failing to sua sponte instruct the jury that Jamie Reed and Derrick Sutton were accomplices as a matter of law" pursuant to CALCRIM No. 335.

#### A. Additional Factual Background

During the jury instruction conference, the trial court stated that in regards to defendant, Sutton, Reed, and Alyssa G., it would instruct the jury on CALCRIM No. 334.

Trial counsel did not object. Subsequently, the jury was instructed with CALCRIM

No. 334 as follows:

"Before you may consider the statement or testimony of Jamie Reed, Alyssa G[.], Derek [*sic*] Sutton, and [defendant] as evidence against the defendant, you must decide whether Jamie Reed, Alyssa G[.], Derek [*sic*] Sutton, and [defendant] were accomplices. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if:

"1. He or she personally committed the crime;

"OR

"2. He or she knew of the criminal purpose of the person who committed the crime;

"AND

"3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime.

"The burden is on the defendant to prove that it is more likely than not that Jamie Reed, Alyssa G[.], Derrek [*sic*] Sutton, and [defendant] were accomplices.

"An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he or she is present at the scene of a crime, even if he or she knows that a crime will be committed or is being committed and does nothing to stop it.

"A person may be an accomplice even if he or she is not actually prosecuted for the crime.

"If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness.

"If you decide that a declarant or witness was an accomplice, then you may not convict a defendant … based on his or her statement or testimony alone. You may use a statement or testimony of an accomplice that tends to incriminate the defendant to convict the defendant only if:

"1.  The accomplice's statement or testimony is supported by other evidence that you believe;

"2.  That supporting evidence is independent of the accomplice's statement or testimony;

"AND

"3.  That supporting evidence tends to connect the defendant to the commission of the crime.

"Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.

"The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice.

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

## B.    Forfeiture

As noted above, a failure to object to instructional error forfeits the issue on appeal unless "the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights."  (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 719.)  Defendant concedes CALCRIM No. 334 "was a correct statement of the law," but argues "the forfeiture rule does not apply when the court has a sua sponte duty to provide the [CALCRIM No. 335] instruction."  However, as we discuss in further detail *post*, the trial court has a sua sponte duty to provide CALCRIM No. 335 *only* when it "'concludes that the witness is an accomplice as a matter of law or

36.

the parties agree about the witness's status as an accomplice,' … [and] [i]f there is a dispute about whether the witness is an accomplice, give CALCRIM No. 334." (*People v. Johnson*, *supra*, 243 Cal.App.4th at p. 1269, quoting Bench Notes to CALCRIM No. 335.) Here, both parties did not object to the trial court providing CALCRIM No. 334, and thus, there appeared to be a dispute as to the witness's status as an accomplice.[9] Accordingly, the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 335, and therefore, defendant forfeited this instructional error claim on appeal. However, even if we assume the claim was properly preserved on appeal, the claim still fails on its merits.

## C.     Applicable Law

A trial court has a sua sponte duty to instruct the jury on how to treat accomplice testimony if the trial evidence suggests that a witness could be an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331; *People v. Guiuan* (1998) 18 Cal.4th 558, 569.) "Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law." (*People v. Valdez* (2012) 55 Cal.4th 82, 145–146; see *People v. Fauber* (1992) 2 Cal.4th 792, 833–834; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960.) "The Bench Notes to CALCRIM No. 335 are in accordance with this statement of the law and, in no uncertain terms, advise that a trial court should: 'Give this instruction *only* if the court concludes that the witness is an accomplice as a matter of law or the parties agree about the witness's status as an accomplice.['] [Citations.] If there is a dispute about whether the

---

**9**The prosecutor did raise an issue with the language of CALCRIM No. 334 where it stated "[t]he burden is on the defendant to prove that it is more likely than not that Jamie Reed, Alyssa G[.], Derrick Sutton, and [defendant] were accomplices." However, the trial court responded "[i]t's the law" and that "there wasn't an agreement that [defendant] was an accomplice, hence 334." Therefore, the trial court properly concluded there was a dispute as to the accomplice issue and deemed CALCRIM No. 334 the appropriate instruction.

witness is an accomplice, give CALCRIM No. 334." (*People v. Johnson*, *supra*, 243 Cal.App.4th at p. 1269, italics added.)

We review a claim for instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.) We consider the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*Houston*, *supra*, 54 Cal.4th at p. 1229.)

### D. Analysis

Here, the trial court correctly instructed the jury it had to determine whether Reed and Sutton were accomplices pursuant to CALCRIM No. 334, rather than instructing they were accomplices as a matter of law pursuant to CALCRIM No. 335. The evidence does not support a clear and undisputed conclusion Reed and Sutton were accomplices as a matter of law. "'[P]roof of [direct] aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'" (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 127, quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) "[W]here there is no direct evidence that a witness acted with the requisite knowledge and intent, the witness is not an accomplice as a matter of law." (*People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1375; see, e.g., *People v. Carrasco* (2014) 59 Cal.4th 924, 969 [witness not an accomplice as matter of law although he accompanied defendant to crime scene and

38.

helped defendant escape after the murder, where witness denied knowledge of and intent to assist defendant in committing the robbery and claimed defendant forced him to assist in the escape]; *People v. Valdez*, *supra*, 55 Cal.4th at pp. 146–147 [witness was not an accomplice as a matter of law despite evidence he drove the perpetrators to the crime location after being told by the perpetrators that they had to go there "'to take care of something,'" which the witness understood to mean assault or kill someone]; *People v. Williams* (2008) 43 Cal.4th 584, 637 [witness was not an accomplice as a matter of law where he denied having the intent to further the defendant's criminal purpose and claimed to be present with the defendant for another reason]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90 [presence at the scene of a crime or failure to prevent its commission insufficient to establish aiding and abetting].)

Here, there is no evidence Reed acted with the knowledge of defendant's unlawful purpose. Although the record shows Reed concocted the plan to rob Leon, there is no evidence she was aware of defendant's involvement in the robbery until *after* the offenses were already in motion. Further, there is no evidence Reed was aware of the kidnapping, torture, or the murder.

Additionally, although defendant approached Sutton to involve himself in the robbery and told Sutton he wanted to use real firearms, defendant testified he was unaware of the plans to rob Leon, never spoke with Sutton, and instead involved himself in the altercation to try and "defuse" the situation. Because of this conflicting evidence, Sutton's status as an accomplice was disputed. Accordingly, the trial court properly instructed the jury as to Reed and Sutton with CALCRIM No. 334.

However, even if we assume the trial court erred by not instructing the jury with CALCRIM No. 335, any error was harmless. Our Supreme Court has held that it is state law error when a trial court fails to instruct a jury regarding consideration of accomplice testimony and, as a result, a reviewing court must evaluate whether it is reasonably

probable that such error affected the verdict. (*People v. Williams* (2010) 49 Cal.4th 405, 456; *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 214.) First, the full context of the jury instructions minimized any potential prejudice from CALCRIM No. 334. (*Houston*, *supra*, 54 Cal.4th at p. 1229.) At the outset, CALCRIM No. 334 instructed the jury that "[i]f you decide that a declarant or witness was an accomplice, then you may not convict a defendant … based on his or her statement or testimony alone," and that "[a]ny statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution … [and] [y]ou should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence" (CALCRIM No. 334). Further, the jury was properly instructed on how to evaluate both Reed's and Sutton's testimony (CALCRIM No. 226 [Witnesses]; CALCRIM No. 302 [Evaluating Conflicting Evidence]; CALCRIM No. 318 [Prior Statements as Evidence]).

Second, the evidence sufficiently corroborated Reed's and Sutton's testimony. Alyssa G. testified she witnessed the conversation between Reed and Sutton and confirmed Reed concocted the plan and that Sutton "was just going along" with whatever Reed said. After Leon left the apartment, Alyssa G. observed Reed text Sutton that it was "go time." Alyssa G.'s personal observations sufficiently corroborated Reed's and Sutton's testimonies. Accordingly, even if the trial court erred in not instructing the jury with CALCRIM No. 335, any error was harmless.[10]

---

[10]Alternatively, defendant contends that trial counsel was ineffective for failing to object to CALCRIM No. 334. "Because we have addressed the merits of the underlying contentions and have concluded, above, that the actions at issue were not erroneous or improper, that the instruction[] w[as] not warranted, or that any alleged error was not prejudicial, defendant's related claim[] of ineffective assistance of counsel fail[s] and do[es] not require further discussion." (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

40.

**IV. Defendant Did Not Receive Ineffective Assistance of Counsel When His Counsel Failed to Request the Jury Be Instructed with CALCRIM No. 350**

Finally, defendant contends he received ineffective assistance of counsel when his trial counsel failed "to request an instruction on how to consider evidence of [his] character for nonviolence." Specifically, he argues, "Reed's testimony qualified as evidence of [his] character for nonviolence that would have required the court to instruct the jury with CALCRIM [No.] 350 had [trial counsel] requested it."

**A. Additional Factual Background**

During Reed's cross-examination, the following exchange occurred between Reed and trial counsel:

"[TRIAL COUNSEL]: Q. Have you ever known [defendant] to be violent?

"[REED]: A. No.

"[TRIAL COUNSEL]: Q. Have you ever known [defendant] to be vulgar?

"[REED]: A. No, sir.

"[TRIAL COUNSEL]: Q. Have you ever known [defendant] to pick on anyone?

"[REED]: A. No, sir.

"[TRIAL COUNSEL]: Q. He's just helped everybody in that place, didn't he?

"[REED]: A. Yes, sir."

Following this testimony, trial counsel did not request that CALCRIM No. 350 be provided to the jury.

**B. Applicable Law**

As noted above, to demonstrate ineffective assistance of counsel, defendant must show (1) his counsel's performance fell below an objective standard of reasonableness

41.

and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland*, *supra*, 466 U.S. at pp. 687–688.) We evaluate counsel's conduct with deference and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id*. at p. 689.) "In light of the deferential standard, appellate courts do not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight, and, for this reason, tactical errors do not generally provide a basis for reversing a conviction." (*People v. Clotfelter*, *supra*, 65 Cal.App.5th at p. 55.)

CALCRIM No. 350 instructs a jury that evidence of a defendant's particular character trait may, by itself, create a reasonable doubt as to the defendant's guilt.[11] Upon request, a defendant is entitled to an instruction informing the jury that opinion or reputation evidence of one of the defendant's good character traits offered to prove the defendant acted in conformity with that trait should be weighed as any other fact established, and that such evidence may be sufficient to create a reasonable doubt as to his guilt. (*People v. Bell* (1875) 49 Cal. 485, 490; Evid. Code, § 1102, subd. (a); see *People v. Jones* (1954) 42 Cal.2d 219, 224 ["Proof of the good character of the defendant may be considered as a fact tending to rebut the truth of testimony of an incriminatory

---

[11]CALCRIM No. 350 provides:

"You have heard testimony that the defendant (is a _____ *<insert character trait relevant to crime[s] committed>* person/ [or] has a good reputation for _____ *<insert character trait relevant to crime[s] committed>* in the community where (he/she) lives or works).

"Evidence of the defendant's character for _____ *<insert character trait relevant to crime[s] committed>* can by itself create a reasonable doubt [whether the defendant committed _____ *<insert name[s] of alleged offense[s] and count[s], e.g., battery, as charged in Count 1>*]. However, evidence of the defendant's character for _____ *<insert character trait>* may be countered by other evidence of (his/her) character for the same trait. You must decide the meaning and importance of the character evidence.

"[If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.]

"You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

42.

character which is sufficient to establish the truth of the charge against him"].) However, the trial court has no duty to instruct on an aspect of the defense that is not supported by substantial evidence. (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370.) "'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'" (*People v. Lewis* (2001) 25 Cal.4th 610, 645.)

## C. Analysis

Here, trial counsel was not deficient for failing to request the CALCRIM No. 350 instruction. First, the only evidence regarding defendant's character was Reed's answers of "no" when asked by trial counsel whether defendant was "violent," "vulgar," or whether he had ever "pick[e]d on anyone." During defendant's testimony, he never offered any additional evidence regarding his good character. (See generally *People v. McFarland* (2000) 78 Cal.App.4th 489, 495 [holding that an expert's opinion was inadmissible pursuant to Evid. Code, § 1102 because "[a]ppellant presented no evidence regarding his character"].) Therefore, trial counsel could have reasonably believed there lacked "substantial evidence" to warrant a CALCRIM No. 350 instruction.

Defendant refers this court to *People v. Wilson* (1913) 23 Cal.App. 513, which concluded it was reversible error when the trial court refused to instruct on character evidence after the defendant introduced evidence of his good character. (*Id*. at pp. 523–526.) However, in *Wilson*, defendant introduced "the testimony of several witnesses who had been acquainted with him for many years, showing the defendant's good reputation" (*id*. at p. 523), and the court concluded he was prejudiced because "if the jury had been instructed upon the law concerning their duty to consider the evidence of [his] previous good character as a part of the evidence upon which they were to determine the question of his guilt or innocence, such instruction would have added a *substantial* item to the balance in [his] favor and might have changed the verdict" (*id*. at p. 526, italics added).

43.

Here, as noted above, the *only* evidence of defendant's character was Reed's one-word answers regarding defendant's lack of being violent, vulgar, or having never picked on someone.  Therefore, *Wilson* is distinguishable from the facts of this case.

Second, even assuming trial counsel was deficient for failing to request the CALCRIM No. 350 instruction, defendant is still unable to establish prejudice.  Again, this evidence was minimal and not so complex and long-winded that the jury needed direction in order to properly consider the evidence.  We do not consider the lack of an instruction in isolation, but rather consider all the instructions as a whole.  (*Houston*, *supra*, 54 Cal.4th at p. 1229.)  Further, as noted above, the evidence regarding defendant's guilt was overwhelming and thus there was no reasonable probability he would have achieved a different result had this instruction been provided.  Accordingly, defendant was not prejudiced.

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.